CITY OF CLEVELAND v. CLEVELAND, C., C. & ST. L. RY. CO. et al.

(Circuit Court, N. D. Ohio, E. D.   March 1, 1899.)

No. 5,730.

1. EJECTMENT—WHEN IT LIES—RECOVERY OF POSSESSION OF STREETS BY CITY.
    Ejectment will lie by a city to recover possession of streets in which the public has an easement.

2. COURTS—FOLLOWING PRIOR DECISIONS.
    Defendants, claiming as licensees of a city, in a suit by adverse claimants, set up and successfully maintained the right of the city to certain land under a dedication for street purposes. *Held* that, in a subsequent action by the city against the defendants, the evidence being practically the same, the former decision, as to the validity of the dedication as claimed by the city, would be followed on the principle of stare decisis, though the city was not a party to the adjudication.

3. MUNICIPAL CORPORATIONS—ABANDONMENT OF STREET—INTENTION.
    Where a city had granted, or attempted and assumed to grant, the right to defendants to use ground it claimed as a street, its acquiescence in such use, for any length of time, will not operate as an abandonment of its claim to the property.

4. ESTOPPEL—ACTS IN PAIS—CONSTRUCTION OF PARTY'S CONDUCT.
    The conduct of a party, sought to be made the basis of an estoppel against him, must be viewed in the light of the understanding he then had of his rights, and not in the light of such rights as they may be thereafter determined.

5. SAME—ACTS OF CITY.
    In 1849 the city of Cleveland entered into a contract with certain railroads, by which it granted them the right to use a portion of a tract of land claimed as a street. Not long afterwards, in a suit against the railroads by an adverse claimant, the defendants alleged their interest in the land to be that of licensees of the city, and successfully defended on the city's title under a prior dedication. *Held*, that the city, by permitting the railroads to remain in undisturbed, or even exclusive, possession of the ground for 45 years, and to expend large sums in the construction of improvements thereon without objection, was not estopped, as against them, to claim any rights in the property consistent with the contract, according to the construction and meaning given it by the defendants in their pleading in the former suit, where they had never given notice of any other or different claim.

6. LIMITATION OF ACTIONS—EJECTMENT—NATURE OF DEFENDANTS' POSSESSION.
    Nor can the defendants in such case successfully plead limitation against an action by the city, whatever may be the true construction of the contract under which they took possession, or the nature of their rights otherwise acquired, as by their own admission, in a sworn pleading, their holding was not adverse to the city, and it had the right to rely on such admission until notified that they claimed under a different tenure.

7. SAME—ADMISSIONS IN PLEADINGS.
    A formal allegation in a petition in ejectment that, on the date it is filed, defendants unlawfully keep the plaintiff out of possession of the property, is not an admission that defendants' possession is adverse,
    93 F.—8

which will support a plea of limitation, on proof that they have held in the same right for more than the statutory length of time.

8. RAILROADS—RIGHTS TO PUBLIC GROUNDS—CONSTRUCTION OF CONTRACT WITH CITY.

Under the constitution of Ohio of 1802, the only restriction upon the exercise of the power of eminent domain by the legislature was the provision that money compensation should be made for private property when taken for public use, and by the railroad act of 1848 (46 Ohio Laws, p. 40) railroads companies were given power to construct and maintain railroads between the points named in their respective charters, and to appropriate streets or other public grounds to their use when necessary, either by agreement with the public authorities, or, such agreement failing, by a decree of a court. *Held*, that a contract made in 1849, while such act was in force, between a city and a railroad company, by which the city granted, "as fully and absolutely" as it had the power or legal authority to do, the right to the "full and perpetual use and occupation" of a portion of a street required by the railroad company for terminal purposes, did not reserve to the city any rights in, or control over, the property described, but that the railroad company took from the state, under the statute, and not from the city, an easement of a perpetual and exclusive use.

This was an action of ejectment by the city of Cleveland against the Cleveland, Cincinnati, Chicago & St. Louis Railway Company, the Lake Shore & Michigan Southern Railway Company, the Cleveland & Pittsburgh Railroad Company, and the Pennsylvania Company, to recover possession of ground claimed as a street, and accretions thereto, which was occupied by defendants, with their terminal buildings and tracks. The action was tried to a jury, and at the conclusion of the trial the court charged the jury in favor of the defendants, and also filed an opinion upon the legal issues involved.

Geo. L. Phillips, James Lawrence, and M. G. Norton, for plaintiff.

John T. Dye and John H. Clarke, for defendant Cleveland, C., C. & St. L. Ry. Co.

M. R. Dickey and John H. Clarke, for defendant Lake Shore & M. S. Ry. Co.

Squire, Sanders & Dempsey, for defendants Pennsylvania Co. and Cleveland & P. R. Co.

## INDEX.

                                                                        Page
CHARGE ..................................................................... 114
STATEMENT OF FACTS......................................... 115
OPINION—
    Ejectment ..................................................... 117
    Dedication ..................................................... 120
    Abandonment ................................................. 122
    Estoppel ....................................................... 123
    Statute of Limitations...................................... 131
    Contract ....................................................... 133
("A") CONTRACT OF 1849......................................... 139
("B") ANSWER IN HOLMES CASE............................... 141
("C") ANSWER IN PRICE & CRAWFORD CASE............ 146
("D") RAILROAD ACT OF 1848.................................... 147

## CHARGE.

HAMMOND, J. Gentlemen of the Jury: The first thing in order is the apology that I owe you and counsel in this case for the delay

which I have caused. But to give the case proper consideration, in view of its vast importance and interest, I felt that it was necessary that I should not slur it in any respect, but should take whatever time was necessary.

Now, gentlemen of the jury, having said that much, the plaintiff having shown no right of recovery in this case, it is my duty to direct your verdict for the defendant railroad companies, and the clerk will furnish you with a form of verdict to be signed by your foreman.

This, technically, is all I need say to you, and we might close this case here. But I shall file with the record an opinion to justify this action, and will now read it in your hearing, that you may understand why it has been done, and justify me, if you may, by your judgment of agreement with that of the court in this method of disposing of the case. I adopt this plan to avoid an unnecessary and erroneous practice, when the reasons for directing the verdict are given in the form of a charge to the jury, of taking exceptions to the reasoning of the court as a basis of error. Exception to the instruction to the jury to find a verdict for the plaintiff or the defendant is all that is necessary in that behalf.

## STATEMENT OF FACTS.

HAMMOND, J.    Referring to the case of Holmes v. Railroad Co., 8 Am. Law Reg. (O. S.) 716, 93 Fed. 100, where Mr. Justice McLean, in his opinion in that case, relates the historical facts that have been proven also in this case, it is only necessary to further state that at the time of the dedication, in the year 1796, by the original proprietors of the Western Reserve, known as the "Connecticut Land Company," Bath street extended about 1,000 feet from Water street, westward to the Cuyahoga river, with an irregular width, ranging from about 60 feet to 200 feet, extending to the low-water mark of the waters of Lake Erie. The topographical character of the locus in quo was that of an almost impassable roadway, except along the sands of the beach, and with such crude excavations and gradings as had been made from time to time, until 1849, when the contract mentioned in the opinion of the court was made, except that in 1827 the government of the United States constructed a pier extending out to the then existing harbor line of deep navigation. This cut off a part of Bath street, and left it on the west side of the mouth of the Cuyahoga river, as reconstructed. The building of this pier exercised a very considerable influence on the topography of the surrounding locality, by immediately causing sand deposits and other accretions east of the pier, and at the edge of Bath street, which grew continuously. At the making of this contract, in 1849, Bath street, as it then existed, was split longitudinally from the pier eastward to Water street, leaving 132 feet south of the line for the use of the city as a highway, which strip was renamed "Front Street," as the 100 feet before laid off had been named "Bath Street." All north of it, to the waters of the lake, was included in the contract of 1849 between the city and the railroad company. Immediately after the contract, or a little before, one of the railroad companies had commenced to lay its tracks upon the part assigned to them, it being

necessary to drive piles to support the tracks and keep them from being overflowed by the water,—indeed, they ran somewhat into the water when the waters of the lake were high, through winds or storms; and the structures then built—the freight houses and depots—were also built on piles extending into the lake, under which the waters were constantly found. The purpose of the railroad companies, which had combined together for the common object, was to use this strip of ground for the location of their terminal facilities in this city. For this land the railroad company paid to the city, under the contract, $15,000 in their stock.

Prior to that time the heirs at law of the original proprietors, Camp & Lloyd, vendees of the three trustees appointed by the Connecticut Land Company, were disputing with the city about its rights of ownership and the validity of the dedication, and also with the railroad companies, as is shown in the opinion of the court. There were also some nine ejectment suits that had been brought by lessees of these rival claimants against the city, for the recovery of all of Bath street, including the 132 feet assigned to the city for a roadway and street. By the contract the railroad companies assumed the defense and settlement of all these suits and rival claims, not only to the part which they had acquired under the contract, but also to that part which had been assigned to the city; and they were finally, at the expenditure of very considerable sums of money, amounting, indeed, to over $50,000, paid to these claimants in one way and another, settled by the railroad companies. The railroad companies immediately commenced to improve the property by driving piles in the water and filling the ground sufficiently to construct thereon their stations, machine shops, and other structures necessary for the operation of their railroad at its terminus.

At the time Judge McLean decided the Holmes Case, these reclamations of land from the waters of the lake, with the natural accretions, amounted to about 20 acres. This was in 1853. Now, in 1899, it is shown, by the proof and maps in this case, that it has increased to 51 and some tenths acres, upon which the railroads have constructed, with solid foundations of pilings and stone, their most important terminal tracks, and the necessary facilities for their use, in the way of round houses and freight houses, and piers constructed for the landing of the vessels engaged in the navigation of the lake, to receive therefrom the freights which they carry up and down the lakes. The city spent no money in all these years for the improvement of that part of the street, and substantially it ceased to be a highway for the public, except in a casual and very limited way, for those who were engaged in fishing or otherwise above the waters of the lake. Indeed, from almost the beginning, the use of the railroad companies became almost exclusive of that part of Bath street lying next the lake, which they had acquired by the contract. Neither did the city take any control of any kind over the street, or in any wise pay that attention which owners of those jointly possessing a parcel of ground might be expected to do, who were claiming the use of it. The railroad companies spent largely over half a million of dollars in redeeming the land from the lake, and largely more

than a million of dollars in the improvements put upon it,—the build-ings, and tracks, and all manner of terminal structures.

This suit was brought by an action of ejectment, in the court of common pleas, in August, 1893, and removed from that court, on the ground of local prejudice, in the year 1898, upon the claim that the contract of 1849 was an invalid exercise of power by the then exist-ing city government, which had no authority to transfer its streets for any such purpose as that disclosed by these operations of the railroad company. It was not denied that they had the power to authorize the railroad companies' to lay their tracks longitudinally on the street, to the extent of their main tracks, for the purpose of making connection with other roads, or passing their roads through the land upon which the city is situated to the places beyond to which they desired to go; but it was denied that they could transfer it for any other purpose, or that there could be anything else than a joint occupation by the public as a highway and the railroad compa-nies as a highway, with a paramount municipal control of the city over the whole territory from the waters of the lake to the southerly boundary of Front or Bath street; that any grants by the city of any facilities for the use of the property beyond that were utterly void, for want of express legislative authority.

The defendant companies filed answers, setting up the defense of the general issue or denial; that the dedication was insufficient to convey title; that they held a paramount title through purchases from Lloyd and Camp and others, claiming from the original proprie-tors a better title than the city had by the dedication; that the street had been vacated or abandoned by the city; the statutes of limitations through adverse possession for 21 years; estoppel by rea-son of the silence of the city for nearly 50 years, during which time no objection had been made by the city to the vast improvements, and sums of money expended in the improvements, by the railroad companies; and that ejectment would not lie to recover the posses-sion of the street, under the circumstances of the case, or under the statutes of Ohio regulating an action to recover land.

The other essential facts will appear in the opinion of the court, and in that of Mr. Justice McLean as reported in 8 Am. Law Reg. (O. S.) 716, 93 Fed. 100.

## OPINION.

### EJECTMENT.

HAMMOND, J. It must be conceded to the plaintiff city that ejectment lies for the recovery, by a municipal corporation, of the rightful possession of its streets. This was held when deciding the motion for "judgment on the pleadings," as it is called in Ohio prac-tice, and the court then reserved the filing of an opinion to support that ruling, which has been prevented by the arduous duties of the trial, but may yet be done. It is sufficient now to refer to the case of Village of Fulton's Lessee v. Mehrenfeld, 8 Ohio St. 440, where such an action was sustained; 9 Am. & Eng. Enc. Law (2d Ed.) 82, note 1; 2 Dill. Mun. Corp. (4th Ed.) § 662; Newell, Ej. pp. 32, 49, 53; Elliott, Roads & S. 485, 486, 490, 493, 495, 501, note 2; Cooley, Torts, 437.

These authors cite the conflicting cases, and Mr. Newell remarks that "the current of modern authority, in regard to easements of right of way, etc., is strongly in favor of upholding the right to recover in ejectment the land, subject to the easement." Newell, Ej. p. 53, § 51. This author cites Barclay v. Howell, 6 Pet. 498, as do counsel here, against this ruling, but that is a misapprehension of that case, in my judgment. That was ejectment, by claimants from the original owner, involving streets of the city of Pittsburg, under circumstances very much like some of those we have here. See same case in the court below (Fed. Cas. No. 975), where the facts more definitely appear. The supreme court did say that, if the dedication had been for a particular purpose, and the city had appropriated the ground for an entirely different purpose, it might afford ground for resort to a court of equity to compel a specific execution of the trust, by sustaining the use or removing the obstructions. But it did not say that "ejectment would not lie," even in that case; only that, the use still remaining in the public, it would be a good defense, presumably either at law or in equity; that, under the supposed circumstances, the land would not revert to the original owner, and he could not recover it in ejectment, not because ejectment would not lie, but because, there being a good defense, it must fail, as the court said the proposed bill in equity would fail, and for the very same reason,—that the plaintiff could have no cause of action, the land not belonging to him by reversion. And that action of ejectment was remanded for a new trial because, inter alia, the court below had given erroneous instructions on that point to the jury. What the court means is that one having only a claim to a reverter when the easement has terminated must, before its termination, confine the use of the easement within its limits by a resort to equity, as he is not entitled to possession; and it never meant to hold, and does not, that if the right of possession already has accrued ejectment would not lie; far less that if the plaintiff has a right of joint possession or of qualified possession, in præsenti, he cannot bring ejectment, but must go into equity.

I have no doubt that either of the parties to this suit would feel more comfortable in a court of equity, the one in prosecuting its claim where there is more elasticity of remedy, and the other a wider range of defense. But, while it is a very rigid rule of our federal jurisprudence that one having an adequate remedy at law cannot go into equity, there is no requirement that, if his remedy at law be inadequate, he must go into a court of equity. He is permitted to go, but not compelled. And it is somewhat a reversion of the rule to suppose that, because one may go into a court of equity, he shall not go into a court of law, where his remedy is embarrassed. Under the influence of modern improvements, authorizing a court of law to model its judgments and conform them to the exigencies of the facts, much of the embarrassment is relieved. It is held in many cases that this extends to our modern forms of action to recover land, and the verdict and writ of possession may be thus framed to suit the case. City of St. Louis v. Missouri Pac. Ry. Co., 115 Mo. 13, 21 S. W. 202, is an example of these cases. And in the

case of Irwin v. Dixion, 9 How. 10, it was held that the remedy by injunction to redress the violation of the public's right in a highway is not a favored remedy. See Rapalje's Ed. and notes. At common law, the king's remedy was by criminal information or indictment, possibly also by civil information, and either the king or an individual might, without judgment at law, abate a nuisance in the highway by directly removing it by the strong hand, without breach of the peace, and under special circumstances a bill for injunction would lie. The owner of the legal estate could always bring ejectment, and now Mr. Dillon says, to encourage that remedy, a municipality is treated as having a legal estate for that purpose, although the naked legal title may be outstanding.

Mr. Justice McLean, in the case of Holmes v. Railroad Co., 8 Am. Law Reg. (O. S.) 716, 93 Fed. 100, where the facts of this case were involved, seems to hold that the city acquired the fee of Bath street by the dedication, which, if so, would relieve all technical objection to this action of ejectment. Counsel for the city hesitate to adopt that view, and suggest that, under the statutes of Ohio, it is, if a statutory dedication, in the county; if only a common law dedication, then in the state, or the descendants of the original proprietors, but only as a bare legal estate, which is of no consequence in this case. This view might possibly avoid a full disseisin, by operation of the statute of limitations in favor of the defendants, and confine that operation to the lesser estate of an easement, the city not holding or claiming any greater estate, but this point may be reserved until we consider that defense in disposing of this case. On the point of the right to bring ejectment, I should be inclined to hold, with Mr. Justice McLean, on the facts, that originally, by the dedication and abandonment of the Connecticut Land Company, the legal estate, as well as the easement, passed to the city. Whether the legislation subsequently had in Ohio devested the legal estate, and lodged it in the county of Trumbull, and by succession it has passed to the county of Cuyahoga, is another question. Either way, on the authorities, I have no doubt of the right to bring ejectment. The trouble is that the plaintiff does not claim full possession of the locus in quo, but only a somewhat indefinitely defined and qualified possession, which it is proposed to regulate by the form of the judgment, which the defendants think to be impossible, while the city is willing to take judgment for the possession of the street qua street, subject to whatever superimposed easement the defendants have established by the proof here, or may establish hereafter by proper proceedings to that end.

The case of City of Cincinnati v. White's Lessee, 6 Pet. 431, refers to the impracticability of the plaintiff's taking possession of a soil burdened with a highway, and argues very strongly against the availability of an action in ejectment, even by the owner of the soil in fee burdened with an easement; but it does not decide against it, and certainly does not decide that the city may not bring ejectment to recover its easement of a public street. That case decided, and was so treated by the supreme court in Dickerson v. Colgrove, 100 U. S. 578, and other cases following it, "that a title by dedica-

tion operated, by estoppel in pais, to preclude the owner of the soil, although he might have the naked legal fee, from maintaining eject-ment, because he had dedicated irrevocably the right of possession; that, since that ordinary accompaniment of the legal fee had been cast off by the act of dedication, the owner of that fee had denuded himself of the right of possession." Manifestly, that case has no ap-plication here, where the city, which the owner had thus clothed with the right of possession, is suing for it. Besides, this action, as we have shown, is sanctioned by the local law of Ohio, and that gov-erns here. Village of Fulton's Lessee v. Mehrenfeld, supra.

Believing, as we do, that ejectment, inadequate as it may be, in respect of the kind of judgment to be rendered and writ to follow, is a remedy to which the plaintiff has a right to resort, the special request of the defendants to instruct the jury to find for them, be-cause there is no evidence tending to show that the city ever had any other estate than an easement, and as an easement in a public street is not a legal estate of which the city is entitled to possession, within the meaning of section 5781 of the Revised Statutes of Ohio, the action cannot be maintained, is refused. That section is not different in that respect from the common-law action of ejectment, brought in Village of Fulton's Lessee v. Mehrenfeld, supra.

### DEDICATION.

On the authority of the case of Holmes v. Railroad Co., 8 Am. Law Reg. (O. S.) 716, 93 Fed. 100, it must be conceded that the city of Cleveland had a complete right of possession to the land in con-troversy in this case when the indenture of September 13, 1849, was executed by the city to the Cleveland, Columbus & Cincinnati Rail-road Company, the same defendant in that case and in this. Whether that right to possession was a title in fee, or only an ease-ment for the use of the land as a street and a public landing, it is perhaps not essential to here decide, though its determination might relieve the case of some of its other perplexities.

Mr. Justice McLean, on the proof before him, seems to have thought that the quantum of ownership held in trust by the city for the pub-lic use included the fee or legal title as well as the easement, upon the ground that the easement had been effectually dedicated to the city for the use of the public, and the fee, having been abandoned by the Connecticut Land Company, was acquired by the city as the first taker. There may be technical difficulties in thus picking up a lost or abandoned legal title or fee without grant, deed, or other paper title, but there can be none, under the operation of the statute of limitations, by adverse possession. So that when that case was tried, and now, it might be held, in an action at law, that the city, by operation of that statute, had acquired the fees in support of the easement already obtained by the dedication, just as it was then held in a court of equity to have been acquired by laches. But in this place it is not necessary to further consider that question, and only to decide that the city had, in 1849, that ownership of the locus in quo which would entitle it to possession, now, and in this

action, unless that right of possession has been transferred to the defendants by the indenture above mentioned or otherwise.

It is not deemed necessary to support this determination by a relation of the facts or any citation of the authorities used in the argument, other than the Holmes Case, above cited.  The technical record of that case is in evidence before us for a special purpose, to be hereafter mentioned, but, of course, not the proof used on either side, upon which Mr. Justice McLean acted.  And we have had on this trial a repetition of the proof the parties have at hand, as if that case had never existed; and necessarily so, because, the city not being a party to that suit, there could be no estoppel of the defendants by record, upon the doctrine of res judicata.  Yet it almost amounts to that, in practical effect, if not in technical legal consequence. The issue there and here on this point was and is precisely the same; between the defendants here and other parties, it is true, but none the less the same issue.  There the character and extent of the city's ownership was in judgment and determined upon quite the same, if not the identical, proof we have here, judging by Mr. Justice McLean's statement in his opinion of the conclusions of fact that he reached in deciding that case, and making allowance for the lapse of time since then, and the difficulty of procuring precisely the same evidence of those facts which he had before him.  The defendants here make no better case against the city's title than Holmes and his associates did when the defendants took shelter behind that title, and so successfully defended it.  The city aggressively makes here substantially the same case, as to the city's right of possession, that defensively the defendants did there.  Upon the principle, therefore, of stare decisis, if not res judicata, that adjudication, in favor of the city's right of possession, should control our judgment here, even if that case had been wholly between strangers to this suit.

It having been one in which the defendants here were defendants there, and in which they set up and relied upon the validity of the city's title or right of possession, that principle should be all the more readily applied to them here, even if it be not technically an estoppel by record, as it is agreed it is not.  Moreover, that case decides against the Lloyd title set up here by the defendant the Pennsylvania Company, that company having bought it in even before the Holmes Case was decided.  Holmes and his associates, as the heirs at law of the original proprietors, known as the "Connecticut Land Company," claiming the locus in quo by their inheritance, attacked the Lloyd title for fraud in its procurement by purchase from the three trustees of the original proprietors.  It was decided that the purchase was, indeed, fraudulent, but also it was decided that the title of the original proprietors had been alienated by them, so that their heirs at law took no title by inheritance; and this, because the city had acquired that title from the proprietors by dedication and abandonment, as above mentioned.  Therefore the trustees of the proprietors held nothing to convey to Lloyd; which being so, the proof in this case of that title cannot avail the defendant the Pennsylvania Company as a defense to this action.  It does not show a better or paramount title, reaching behind that which the city has

shown. The Holmes Case, supra, settles this invalidity of the Lloyd title, and upon its authority as a precedent, as well as upon our own judgment on the facts here, that point must be ruled in favor of the city. Nor is it at all necessary or proper to submit either the validity of the city's right as above determined, or the validity of the Lloyd title, as a defense to the jury, since there is no disputed fact relating to either worth their attention. The lawyers dispute about it, but there is no conflict in the evidence to be settled by the jury.

### ABANDONMENT.

The defense of abandonment, set up by the defendants, apart from any bearing it may have on the special plea of the statute of limitations, also must be ruled in favor of the plaintiff city. Mr. Justice McLean had before him in the Holmes Case, supra, a bill in equity, with the widest scope for the operation of the principle of the equitable doctrine of estoppel by laches and nonaction, not only in analogy to the legal defense of the statute of limitations, but beyond that, in the sense of a stale claim; and what he says about "abandonment," as a defense, must be taken in view of that freedom which a court of equity has in such a case. The facts he had before him were very, very peculiar, and there is not the remotest analogy on this point to those we have here. The city did not deal with Bath street at all as the original proprietors dealt with the remnants of the Western Reserve by their dispersion from the Connecticut Land Company, so called, and it is a distortion to associate that case with this in respect of the alleged abandonment. The authorities he cites in his opinion, and those used in the argument here, have not been examined to determine whether such a defense is possible in a court of law and in an action of ejectment and on the general issue, as has been claimed here. For my own part, I doubt it; but that is immaterial now and here. The evidence relied on was pertinent alike to the legal defense of the statute of limitations and to the special defense of estoppel set up by one of the replies of the defendants, to be hereafter considered; therefore the evidence was admitted, and we must now consider it only in its bearing under the general denial. Conceding that it is relevant to that general issue as an independent defense in an action of ejectment, yet the defense is not upheld by the proof.

The always present, indispensable, and fundamental element in any abandonment is the intention of the owner to abandon his property,—to desert it,—with a willingness that its ownership may go to the first or any taker, he not caring what becomes of it. That was the case Mr. Justice McLean had before him, as he found from the peculiar facts related in his opinion, and also shown in the trial here by the same evidence he had before him. It turned upon the final meeting of the Connecticut Land Company, when they dissolved their voluntary association, abandoned everything then known and not aparted or divided among themselves, deliberately and confessedly with the intention of making a finality of the whole business, as graphically described by Mr. Justice McLean. There is no evidence in this case tending to show any such intention of abandon-

ment of Bath street or any part of it by the city, and nothing to submit to the jury on that issue. There is evidence tending to show neglect to sue for a part of the street in possession of others, the effect of which, by statute, may be fatal to this action under certain circumstances, but it is a misnomer to call that abandonment. There is evidence, by the contract between the city and the defendants of 1849, tending to show a sale of the whole or a part of the street or a license to use it, possibly exclusively, but the intention manifested by that act is one to alienate and transfer the property to another, or to attempt to do that thing; but this is a wholly different intention from that of abandonment, and it is a distortion to call it so. There is evidence of extraordinary silence for an extraordinary length of time, while others were using the property; but taken with the fact that the city had, or thought it had, granted some kind of permission for that use, the silence does not signify abandonment, whatever else it may imply by way of a denial, in a court of law or of equity, to the city to reclaim its aforetime possession, because of the misconduct of silence, under certain circumstances. In a certain lexical sense, these facts may indicate abandonment, but not in a legal sense. They may be wholly consistent with an enduring claim of ownership, however unavailable in suits to assert it, and whenever there is a continuing claim of ownership there can be no abandonment in fact; the intention to abandon is wanting. As one of the learned counsel for the plaintiff said, one does not abandon one's land by nonuser or nonclaim, though he may lose it because of these, under certain defined circumstances prescribed by law, but it is the act of the law which deprives him of his property. It is not lost by abandonment, as when one throws away his jackknife, to use the illustration of one of the learned counsel for the defendants. Land may be so abandoned, according to the Holmes Case, but the casting away must be as patent in evidence as the ejection of the jackknife.

## ESTOPPEL.

The supreme court of the United States, seemingly, loosened its ancient moorings, upon the subject of the admission of equitable defenses in actions at law, by the judgments in Dickerson v. Colgrove, 100 U. S. 578, and Kirk v. Hamilton, 102 U. S. 68. See, also, George v. Tate, Id. 564, 570; Wythe v. Smith, 4 Sawy. 17, Fed. Cas. No. 18,122; Berry v. Seawall, 13 C. C. A. 101, 65 Fed. 742; Jackson v. Harder, 4 Johns. 202; Campbell v. Holt, 115 U. S. 620, 622, 623, 6 Sup. Ct. 209; Stoddard v. Chambers, 2 How. 284; Railroad Co. v. Paine, 119 U. S. 561, 7 Sup. Ct. 323; Wehrman v. Conklin, 155 U. S. 314, 15 Sup. Ct. 129; Rev. St. U. S. § 723; Drexel v. Berney, 122 U. S. 241, 7 Sup. Ct. 1200; City of Cincinnati v. White's Lessee, 6 Pet. 431; Allen v. Seawall, 17 C. C. A. 217, 70 Fed. 561; Boggs v. Wann, 58 Fed. 681.

A careful reading of these cases, and others that might be added, in comparison and contrast with the first two that are cited, will show that the ratio decidendi of this apparently new departure in our federal practice is that the title "inures" to the defendant by the operation of the estoppel in such a way that it will either main-

tain ejectment for the land or furnish a defense when pleaded at law, notwithstanding any apparent or supposed disturbance of the statute of frauds, and that this "inurement" may be necessary to save the new practice from any infringement of the federal constitution, by uniting legal and equitable remedies in the same action; also these cases will show just what estoppels may and what may not be pleaded at law; and, as to land or any interest in it, the estoppel pleadable at law is that which results when one stands by in silence and sees another, holding his land adversely, improving it. That particular estoppel has been added by these cases to the list of common-law estoppels in pais, mentioned by Lord Coke in the extracts cited from him in some of the cases.

At first I was inclined to think that the estoppel pleaded here was, neither in form nor substance, that justified by the foregoing cases, notwithstanding the similarity, if not identity, of the culpatory facts set up in the plea, nor am I now quite sure of it; but, in the view I have taken of the facts, it is, perhaps, unnecessary to scrutinize them in this regard.

Taking the pleading as good in all things, and the facts for all they are worth to the defendants,—they being substantially undisputed, and furnishing no conflict of evidence to be submitted to the jury,—and, in my judgment, the alleged estoppel has not been established by the proof. It has its foundation in that memorable contract between the city and the defendant railroad companies of September 13, 1849, which so pervades every nook and cranny of this litigation. The "inurement" of title, as it is called by Mr. Justice Swayne, or, if you please, any lesser estate, by estoppel in pais, or any deprivation of right, by whatever name you call it, has not attached to the defendants as a defense perforce of the alleged culpable conduct of the plaintiff, because the contract of 1849, and that which both parties have done under it, during all the years of silence on both sides, until this suit was brought, in 1893, has neutralized the otherwise potential effect of the facts proven in favor of the plea. One of the learned counsel for the defendants somewhat humorously remarked that there is about a set-off as to the "admissions" by the parties concerning proper construction of that most ambiguous and indefinite instrument, which will be reproduced in the margin of this opinion.[1]

Following the suggestion, it may be said that there is likewise a set-off as to the long-continued and culpable silence about the respective conduct of the parties under it.

It must be remembered that this estoppel, as now claimed, was not set up in the original answers, nor for a long time afterwards,—a significant indication of continued silence even after this suit was brought, and an implication that it is an afterthought. This, of course, is not in derogation of any right to set-up the estoppel, soon or late, but it may be fairly taken as evidence of the state of mind of the defendants on the matter of the city's long-continued silence as to its rights under the contract, and how far the defendants' con-

[1] See ("A") at end of this opinion, page 139.

duct was at all influenced by that silence, while making their improve-ments and spending their money, of which they now complain. It tends to show that they had not relied on the silence of the city at that time, or they would not have been so long in pleading it after suit was brought; and the other circumstances of the case confirm the suggestion of the plaintiff that reliance on that silence in spending the money is an afterthought, long after the improvements were made, and never considered before.

The most remarkable feature about this case, as it appears to any impartial mind, is the reprehensible silence of both parties upon the subject-matter now in litigation, if they were ever dealing with each other on the respective footings of either the petition or the answers. If the city has ever, at any time since 1849, claimed to have any "control" over, or right of "possession" to, the locus in quo, as a street, why did it wait until 1893 to set it up for the first time? It has seen the railroad companies taking "exclusive" posses-sion,—a word not in the contract,—or assuming an "exclusive" use; has seen what Judge McLean said in the Holmes Case was about 20 acres of accretions grow into over 51 acres now; and has seen the companies occupy that vast area, and use it exclusively, all this time. Yet it has never exercised or demanded any kind of possession or control for itself or the public, other than its uses by the public for the railroad traffic. Not by any act, syllable, or suggestion has the city indicated that the companies were usurping larger rights or uses than they had under the contract; and all this, for nearly 50 years. On the other hand, the defendant railroad companies, in 1853, four years after the contract, in the Case of Holmes, before cited, defined their understanding of the contract, and by their sworn answers admitted that they held only as licensees of the city. One of these answers, which are all substantially alike, will be copied in the margin, so far as it relates to the admissions of the city's title.[2]

Mr. Justice McLean thus states his construction of these answers:

"The defendants insist that the title to all of said land covered by the water of Lake Erie is in the public, and not in any trustee for them; and, as to the residue of said land, rely for a defense upon the equitable bar fur-nished by lapse of time, want of title in equity in the complainants, and upon a dedication of said land to the public by the Connecticut Land Company, as early as 1796, accepted immediately thereafter, and ever since used in accordance with the purposes of the dedication. They deny that they are in possession under the title derived from said Lloyd, and aver that they are in possession under the authority of a statute of Ohio, in pursuance of a license granted by the city of Cleveland, and using the same in a manner consistent with the original dedication."

Measured by what is now claimed by the defendant companies, who set up an absolute title, by the contract, by estoppel, by the statute of limitations, etc., the construction then given to the instrument is noticeably narrower than is now urged upon us. Indeed, these an-swers quite disclaim any other construction of the contract than that which the city now gives it by the bringing of this suit. They cer-tainly then admitted that the contract is only a license; that the city, after the contract, continued in the rights of licensor and

2 See ("B") at end of this opinion, page 141.

owner of the street, and they acquired only the rights of a licensee. That was then the mutual interpretation of the instrument, or the view of their rights taken by the defendants.

The plea of estoppel, the proof and argument in favor of it, now assume the broader construction of the instrument set up in this litigation in favor of the defendant companies; that the city is a vendor of the whole estate, or, possibly, it would be conceded, minus the naked legal title; and that the companies are the vendees thereof, all by deed of grant sufficient to convey this much-enlarged estate from any that was ever claimed before. Obviously, however, the question of estoppel in pais by silence, etc., is to be governed by the conduct of the parties, judged by the interpretation which they themselves, at the time of the conduct complained of, gave the instrument, and not that legal construction by the courts which is first invoked some 50 years later. The coloring of the conduct of the city, alleged to be culpatory in this matter of estoppel, must, in law and in all fairness, be taken from the then state of mind of the parties, and not that which is subsequently established by the ultimate and conclusive adjudication of the courts. We do not yet know, by any judgment of a court, what is the proper construction of this contract, and how is it possible to impose on the parties a legal conclusion which is retrospectively to give coloring to their conduct in this matter by estoppel in pais. It seems to me impossible, however long the time elapsed, to work an estoppel under such circumstances.

It is said there was no obligation on the defendants to speak; that they might properly keep silent, and permit the lapse of time to cure whatever defects there may have been in their title. In some circumstances this would be true, but not those we have here. After the defendants, almost in the beginning of the contract, had, by their solemn oath of record, admitted that they were only licensees, and nothing more, the city might well rely on that admission and that attitude of the defendants towards the city's rights. It is indisputable that as licensees, under the very terms of the instrument, they might claim the right to spend all the money they did spend in laying tracks, etc., and in erecting costly and lasting structures. It was wholly consistent with that holding to do this. It might have been their folly to so improve, at the cost of immense sums, upon a mere licensee's title, if the license be revocable at the pleasure of the licensor, or at all, under any circumstances. Nevertheless, the formidable character of the improvements and the largeness of the cost, although, under ordinary circumstances, sufficient to put any rival claimant for ownership on notice, and potential enough to invoke the rule to speak up and claim his rights within a reasonable time, do not require him to speak, if he be not in fact a rival claimant, but one whose claim is at that time fully recognized as existing, and, in a certain sense, dominant. If a lessor have a contract with his lessee to improve the estate, the lessee cannot claim that the lessor is estopped by standing by, and seeing the improvements going on without objection, until after he has given notice that he shall claim more than the estate of a licensee, or unless there is something in the character of the improvements

themselves showing that they go beyond the contract, and thereby advise the lessor of a larger claim. There is nothing here of that kind. From the date of the Holmes suit, the railroad companies have never given a breath of notice that they should claim more than they claimed in the Holmes answers. Never, until their pleas in this case. Mr. Justice Field said on the circuit, in Adams v. Burke, 3 Sawy. 415, Fed. Cas. No. 49, that the possession must be hostile, which means adverse, of course, and that entry by permission of another, or with the admission of another's title, would not set the statute of limitations running,—no more will it set an estoppel running,—and that the recognition of another's title after the statute had begun to run, no matter for how brief a period, will avoid the statute. That, too, was the case of a complaint or pleading— "a sworn admission"—that the defendants did not hold the premises by a claim of title hostile to the title of the plaintiff, but with a recognition of that title. The truth is, both these parties have been contented all these years with this mutual construction of the contract, and have been silent accordingly. The question in my mind has been whether they are not now mutually estopped from denying this construction, and ever asking for another. Topliff v. Topliff, 122 U. S. 121, 131, 7 Sup. Ct. 1057; Chicago v. Sheldon, 9 Wall. 50, 54; District of Columbia v. Gallagher, 124 U. S. 505, 510, 8 Sup. Ct. 585. On the other hand, in the year 1851, in the case of City of Cleveland v. Price (Price & Crawford Case), in the supreme court of Ohio, not reported, but the record of which is in evidence here for the same purpose as that in the Holmes Case, namely, to prove the admission of the city as to its construction of this contract, the city's answer thus construed this contract:

"That, after the location of the railroad from Columbus to Cleveland, it became necessary, in the opinion of the directors, to obtain the whole of the tract of land called 'Bath Street,' and they made a formal appropriation of the same by resolution of the 12th of September, 1848. The entire title of that tract was involved in a controversy between the city and Camp & Lloyd. * * * A suit was already pending, which had been decided against the city, and was then depending on exceptions. * * * That the opinions, not only of people generally, but also of men professing to understand the legal questions involved, differed so much as to the probable result that it was impossible to anticipate the event. * * * That respondent wishes to get clear of all controversies, whether legal or otherwise, and for that reason respondent was unwilling to have said company obtain possession of said property by the power given them by their charter; * * * and that respondent believed it to be for the interest of all parties having any interest in said property to make an amicable arrangement, by which said company might be invested with all the rights of this respondent in said property. Upon these views, this respondent, being compelled to transfer to said company said property, and preferring to do so under negotiation, than to have it taken under and by virtue of said company's charter and appropriation, and desirous of avoiding all controversies with said company for the convenience and advantage of this respondent, the said negotiations and contract were made between said company and respondent. * * * Respondent admits that, by the terms of said contract * * * made on the 13th of September, 1849, said company took the interest of said city in said Bath street property, subject to all the rights and privileges of all other persons * * * which could be legally enforced against the property had the city continued to hold the same, * * * but because said company, as this respondent is informed and believes, succeeded to the rights of the city, and having by said agree-

ment with Camp & Lloyd compromised all matters in controversy, the city ceased to make further defense," etc.

The whole of this portion of the answer will be copied in the margin, to more fully exhibit it.[3]

The record explains that the plaintiffs, Price & Crawford, filed the bill against the city, Camp & Lloyd, and the Cleveland, Columbus & Cincinnati Railroad Company, with which the contract of September 13, 1849, was made. They held leases from the city, and alleged that there was a conspiracy between the defendants to deprive them of their property, by making the contract with Camp & Lloyd of August 8, 1849, by which the Camp & Lloyd ejectment suits against the city were compromised and dismissed, and by making the contract of September 13, 1849, by which the railroad company acquired the property according to its terms. They prayed to enjoin the writs of possession in the ejectment suits brought against them, and from disturbing their possession, etc. The bill was at last dismissed, and there was an appeal, and it was again dismissed.

Now, here is the construction by the city of the contract almost immediately after it was made. This and the Holmes suit are of themselves a practical construction by both sides, such as is referred to by the authorities last above cited, and show, beyond all possible question, the construction that both sides have had from that day to the bringing of this suit; neither one having given to the other any notice, by word of mouth, writing, or by act or deed, of any change in the state of mind of either party as to that construction, but, on the contrary, have acted in perfect harmony about it for about the period of 45 years.

These respective admissions were made of record and under oath. In the Holmes Case the defendants here were defending against a claim of title by the heirs at law of the original proprietors, and they set up, by their construction of the contract of 1849, a continuing title in the city, claiming themselves only as licensees, and that they were holding under the city as such. They might just as well have set up the larger title they claim now,—the absolute ownership,—and have defended it in the same way, but they did not. The city, in the Price & Crawford Case, was more liberal to the railroad companies in the construction it gave to the contract than the companies subsequently were to themselves in the Holmes Case. There is nothing in these admissions militating against a claim for that control of the street qua street which is demanded by this action, subject, as they now admit, to whatever easement in the street the railroad companies have acquired by the contract. But the admissions show that there was then quite an entire harmony between them as to the character of the holding of the locus in quo. Whatever quantum of right or title either had under the contract was left open, as the contract itself leaves it open, under its ambiguous and indefinite terms. But whatever other effect these admissions of record may have on the proper construction of the contract, if any, certainly, on the defense of estoppel, they preclude, under all the circumstances of this

[3] See ("C") at end of this opinion, page 146.

case, every possible reliance on the intervening 50 years of silence, as an estoppel to deny the construction of the contract that the defendants now insist upon. The parties acted harmoniously, as to the holding of the property all this time, in a construction of the contract that may have been erroneous; and, if they be not bound irrevocably to that construction by mutual estoppel, certainly neither can take advantage of that silence, which the harmony produced, by any present complaint of it.

That these answers are evidence for that and other purposes in this case is settled by the authorities. Jones, Ev. §§ 206, 207; Slatterie v. Pooley, 6 Mees. & W. 664; Edgar v. Richardson, 33 Ohio St. 581, as to the admissions concerning the doings of the Connecticut Land Company; Jones, Ev. § 236 et seq.; Id. § 241, citing authority that such admissions may operate, if proper foundation is laid, as estoppels in pais; Id. § 274 et seq., as to admissions in pleadings; and Id. § 277 et seq., as to when they operate as estoppels. And when under oath, as to their effect, see Id. § 298; Pope v. Allis, 115 U. S. 363, 370, 6 Sup. Ct. 69; Railroad Co. v. Ohle, 117 U. S. 123, 129, 6 Sup. Ct. 632; Delaware Co. Com'rs v. Diebold Safe & Lock Co., 133 U. S. 473, 487, 10 Sup. Ct. 399; Combs v. Hodge, 21 How. 397, 404. And the admissions of the corporation are likewise binding on its successors by consolidation or other like devolution of corporate existence. Railroad Co. v. Howard, 13 How. 307. These admissions, however, even under oath, are subject to explanations, and thus to be relieved of the estoppel they might otherwise entail. Jones, Ev. §§ 274–277, 298. In a jurisdiction where the sternest rule of estoppel by oath, in aid of public policy and good morals, obtains, it was held that the admissions of an oath might be explained, and, if done, the estoppel does not arise. Behr v. Insurance Co., 4 Fed. 357. No proof is offered in this case of any explanations of the admissions made under oath in the answers in chancery, but the explanations are found in the circumstances. The city and the railroad companies, being at that time harmonious, and altogether friendly, about the use of this street, and perhaps indifferent, so that the use was secured, how it was done or what title was acquired (except that the city said in its answer that it did not desire to have the railroad company take it by appropriation in invitum), were unaffected by any consideration as to the effect the statements then made in the answers would have in the future, as against each other, if they should fall out about the contract. They did not expect to fall out. The language used came of the then existing harmony, but mutual doubt of the city's title and power to convey it. The answers were framed according to the professional strategy of the then employed counsel, who proceeded obliviously of any prospect or expectation of conflict between the city and the companies as to quantum of estate, title, or right conveyed or received. The long time elapsing before any conflict did occur shows only the substantial quality of the amity and harmony on the subject, and has justified somewhat the reliance upon its strength as a factor of safety against any future denial of their mutual construction of the contract. Under such circumstances, no public policy or concern for morals justifies treating these answers as an

estoppel against either side. And the controlling influence of a practical construction of the contract, as shown in the above-cited cases on that subject, does not amount to an estoppel by oath or admission, as the cases themselves declare. The practical construction given by the parties has only a controlling influence under given circumstances, but is not always decisive of the point. Therefore I do not think the parties here are precluded from now resorting to the courts for an authoritative construction of the contract, even at this late day, particularly since the contract itself is so ambiguous, and confessedly describes the thing conveyed indefinitely, and only "as fully and absolutely as said city, or constituted authorities thereof, have the power or legal authority so to do."

It is convenient here to refer to the admission that the defendants held under a license from the city, and the mutual position on that point of both parties to the contract at that time, for the purpose of considering the effect of that construction on the rights of the parties, if it were then or now a proper construction of the contract. It is now argued for the city that the railroad companies hold a license to use and occupy, subject to the joint use of the same ground by the public as a street, and to the city's paramount control of it as yet a street, and that the defendants are estopped by their admission to claim more than that; also that any excessive use by the railroad companies beyond a joint use comes of an implied license, which is revocable, and has been now revoked, by the bringing of this suit. This assumes that the city had no power to grant more than a joint use of the same ground,—no power to split Bath street longitudinally, and assign an exclusive and perpetual use of one side to the railroads, and the other to the public as a highway; which is the very question here involved, and is not quite the position taken by the city in the Price & Crawford Case. It also assumes that a street ceases to be a street when exclusively used by a railroad, and not used by the public as a highway; which is by no means certain, as a proposition of law or fact. But assume the position to be correct, and is it not a mistake to treat the implied license as revocable, as has been done? The language of the contract is that the railroads shall have the "perpetual" use of whatever they have been licensed to use; and does not that imply irrevocability? No other license than this contract has been shown, verbal or written, as to any excessive use,—all implication of it comes from the contract. And if that be the proper relation of the parties to this ground, the railroad companies might be contented to occupy perpetually under this implied license, and. having so occupied it for so long a time, without objection, it might operate as an estoppel in their favor for the excess under the license, while the facts, as already ruled, would not operate an estoppel as against the city to deny that the companies cannot claim to hold absolutely by a title of their own that which they use exclusively by license. So confined, the estoppel might be good, even for the excess. City Ry. Co. v. Citizens' St. R. Co., 166 U. S. 557, 17 Sup. Ct. 653, where it was held that the city of Indianapolis was estopped, by its conduct in granting a license, from denying that the franchise extended 37 years, and

terminated at 30 years,—the 7 years being, according to the city's claim, an excessive grant, for want of power. It is not necessary to extend this consideration, for I am of the opinion that this newly-suggested construction is not more subject to estoppel, on the facts, than the other above considered. They both require us to give a retrospective construction as the foundation for the estoppel, not the one the parties gave at the time and on which their conduct proceeded; for it was not then construed as a grant or sale of that which was within the power and irrevocable, and a revocable license of that which was in excess of the power, but as a license to use all the city had the power to include. Besides, the contract especially allows the companies to erect all structures necessary to operate the railroad, and that there is any excess, as alleged, in doing that, is not so plain, whatever construction be given to the contract itself in other respects.

Again, the defense made by the city against the pleaded estoppel, that no lapse of time will sanction a public nuisance, and that the public rights of highway on the streets cannot be taken away by lapse of time, assumes, again, that the former construction of the contract was correct, and that the city's present construction is the proper one, and therefore the structures and excessive use are nuisances. If they be, by a proper and authoritative construction of the courts, within the contract, they are not nuisances, and therefore the position is not available until that construction has been had. And in the meantime heretofore elapsed anything authorized to be put in the street cannot be treated now as a nuisance, heretofore existing as such, within the purview of the estoppel rule by lapse of time, or of the rule of the statute of limitations, nor until the want of authority has been declared,—then only it becomes a nuisance. Heretofore it has not been, and therefore the lapse of time would operate upon the theory that erection of the obstructions was not unlawful. The truth is both parties are estopped from relying upon the retrospective operation of any new construction of the contract, as a foundation for their present claims, against the old and mutual construction regulating their conduct at the time; and the present appeal to the court for its authoritative construction must proceed upon the theory that what has passed, by mutual error or mistake, does not affect the construction now to be given, and it must be had as of the time when the contract was made, subject, of course, to the influence of the conditions established by the long-continued operation of the parties under their old construction, albeit no estoppels have been worked.

The result of this consideration of the defense of estoppel is that, not having been established by the proof, it cannot avail the defendants to defeat this action, either by way of inurement of title, or by any inhibition on the plaintiff to sue, whether the proposed estoppel be called legal or equitable.

## STATUTE OF LIMITATIONS.

The very same reasoning just adopted as to the defense of estoppel applies with such force as it has equally to the defense of the statute

of limitations. The ambiguity of the contract, and the mutual reliance upon that practical construction the parties gave it at the time of entry, which has governed their contract ever since, until this suit was brought to challenge it, precludes the defendants from taking anything by operation of the statute of limitations. There has been no adverse holding to set the statute to running, at any time within 21 years before this suit was brought.

The bringing of the suit, and a refusal to yield to its demand, is the first manifestation of an adverse holding. If the position be sound that, upon the delivery of the instrument, an adverse holding began as to all the world, including the grantors, according to its terms, it is quite sufficient to say that the terms were ambiguous, and the holding since is entirely consistent with either construction that might be adopted,—that of a license for joint occupation and no exclusive use, as well as that for an absolute estate in fee or an irrevocable and perpetual easement for exclusive use. Soon after the entry the parties mutually adopted the former of these constructions by their respective sworn answers in chancery,—at least, the defendants did,—and since that time each has been as silent as the tomb concerning any possible construction of the contract, other than that, until this suit was brought, in 1893. If the original entry, therefore, set the statute running on the theory above mentioned, it was arrested in 1853, when the defendants filed their sworn answers in the Holmes Case, and has continued arrested ever since. Adams v. Burke, Fed. Cas. No. 49. There Mr. Justice Field said that "that complaint [a sworn statement] is an admission of the highest character that the defendants did not hold the premises by a claim of title hostile to the title of the plaintiff, but with a recognition of that title"; and that "it is too plain for argument that there was here no such adverse possession of the premises as is contemplated by the statute"; and in another place in the opinion that "the recognition of another's title after the statute has commenced running, at any time within the 20 years, no matter for how brief a period, will destroy the continuity of the hostile possession, and avoid the bar of the statute."

If, at any moment after the Holmes Case was ended, the defendants had notified the city that they had changed their minds as to the construction of the contract, and no longer recognized that the city had any joint use or joint control, or municipal control, of any kind, but that they had an absolute title or an exclusive use, then the adverse possession might have begun again; or if they had, by any substantive act, ousted the city, ejected its officials, if any were there, refused any demand, if any were made, for joint use by the public, or the like, the adverse possession would have begun again. But there is not a scrap of evidence that any such thing occurred. It is true the city does not show that it made any claim of joint use or municipal control in all those years, but, if its rights to this had been specifically or impliedly recognized by the construction given to the contract in the sworn answers, the fact that the exercise of joint use or control was not asked, or that the use lay dormant, does not impair the right or create adverse possession. The tomb-like silence, for so long a time, is remarkable, and almost incredible, but it was

mutual, as before mentioned. Nor does the fact that the city proves no such ouster, as above suggested, affect the question of its right of action. In ejectment, a denial of the plaintiff's right or title in the answers or pleas is, of itself, an ouster. Grant v. Paddock, 30 Or. 312, 47 Pac. 712; Noble v. McFarland, 51 Ill. 226.

A somewhat ingenious argument is made that since the petition in this case alleges that on August 17, 1893, when it was filed, "the defendants unlawfully keep said plaintiff out of the possession thereof, whereby said plaintiff is unable to perform the duty imposed by law, to keep the same open and in repair and free from nuisances," there is an acknowledgment of adverse possession on that day; and since the proof shows that the defendants have, for nearly half a century, held precisely the same kind of possession as on that day, the adverse possession to support the statute of limitations is thereby proved. No authority is cited for this, and it is not sound, in my judgment. Adverse possession is not proved by such technical allegation of wrongful withholding in the petition. It is a necessary allegation in every ejectment petition, but it is supported, as the above cases show, by a refusal of the defendant to surrender possession on the demand of the suit and making defense thereto. It is not intended to admit adverse or wrongful possession at any time prior to the filing of the petition, and this proof by analogy is not permissible. Besides, the proof does not show adverse holding, as we have endeavored to show, and the proof is not to be contradicted by this technical averment of the petition characterizing the holding as wrongful. Adverse holding may commence with a denial of plaintiff's title in ejectment pleadings, but it does not follow that it has preceded the suit. Indeed, since the statute of limitations forbids suit after 21 years of adverse holding, the implication to be drawn from the allegations of the petition is that the "wrongful withholding of possession" by the defendants commenced within the time prescribed, and the proof of the required character of the holding must be aliunde this formal allegation, not intended as evidence by comparison.

We do not overlook the difference between title by estoppel and that by force of the statute of limitations, which forbids suit after the 21 years' adverse possession, and thereby vests title in the plaintiff. But the adverse possession required in either is adjudged on the facts by the same circumstances.

This view of the defense made on the statute pretermits any requirement of a verdict from the jury on the question of adverse possession. The existence of the contract of 1849 is not disputed, and that which was done under it is not disputed. Therefore there is nothing to go to the jury on that issue, and we hold that the contract and the admissions of the Holmes answers are insuperable barriers to any claim of adverse possession by the defendants of the character required to support the plea, or of adverse possession of any kind.

## CONTRACT.

In the constitution of Ohio of 1802, in force when the contract of September 13, 1849, was executed between these parties, I do not

find any provision similar to that of the constitution of 1851, adopted soon after that contract was made, declaring that "corporations may be formed under general laws, but all such laws may, from time to time, be altered or repealed." Article 13, § 2 (1 Swan & C. St. p. 50). And that section does not act retrospectively. 1 Swan & C. St. p. 50, note 4, citing Bank v. Wright, 6 Ohio St. 318. Nor could it do that so as to violate the constitution of the United States against impairing the obligation of contracts. Therefore, the act of February 11, 1848, regulating railroad companies, and under which the defendants here were chartered, could not be altered, amended, or repealed by any subsequent constitution of Ohio or statutes passed by the legislature regulating railroads; there being in the act of 1848 no reservation of that power to alter, amend, or repeal, except the reservation of section 1 of the act that the powers conferred might be modified by the special act incorporating the companies. See 46 Ohio Laws, p. 40; 1 Swan & C. St. p. 271.

Again, it has been argued that the construction of the contract is a matter of Ohio law, and to be governed by Ohio decisions in this court. Generally speaking, this is true, but there are exceptions. Chicago v. Sheldon, 9 Wall. 50; Louisville Trust Co. v. City of Cincinnati, 22 C. C. A. 334, 76 Fed. 296. In the first case it is said that "a contract having been entered into between the parties, valid at the time, by the laws of the state, it is not competent even for its legislature to pass an act impairing its obligation, much less could any decisions of its courts have that effect." In the second of these cases it is said that "the general rule touching the duty of United States courts to adopt and follow the construction of state statutes, announced by the highest court of the state whose statute is involved, is well settled," etc. "But there are certain well-recognized exceptions to the general rule. One of them is that, if the contracts and obligations have been entered into upon the faith of existing judicial constructions of state courts, the courts of the United States will not regard themselves as under any duty to conform to later decisions, reversing earlier opinions, upon the faith of which citizens of other states have acquired rights or assumed liabilities." Again, the decision affirms that another exception is that, if the contract has been made, and rights acquired, or obligations entered into, before there has been any judicial construction of the statutes upon which the contract depends, by the state court, a court of the United States, while "leaning to an agreement with the state court," may exercise an independent judgment as to the validity and meaning of the contract, and is not bound to follow subsequent decisions of the state courts construing the statute, if the decisions were made after the rights involved in the controversy originated or attached. In other words, such decisions do not act retrospectively, to establish a construction we are bound to follow.

Neither do I find in the Ohio constitution of 1802 any limitations whatever as to the exercise of the right of eminent domain, except, alone, that of article 8, § 4, that "private property ought and shall ever be held inviolate, but always subject to the public welfare, provided a compensation in money be made to the owner." 1 Swan & C. St.

pp. xix., xxv.   The same provision substantially is made in the constitution of 1851.   Const. art. 1, § 19 (1 Swan & C. St. p. 24, and notes); Const. art. 13, § 5 (1 Swan & C. St. p. 51, and notes).   The cases cited in these notes show that the state courts have decided that the power of eminent domain is not specifically conferred by these constitutions, but is an indispensable incident of sovereignty, and goes with the general grant of legislative power (1 Swan & C. St. p. 24, note 3, citing Giesy v. Railroad Co., 4 Ohio St. 308); also that public property may be appropriated without compensation, including streets and highways, consisting of a perpetual easement in the land covered by them, for all the actual uses and purposes of public travel (1 Swan & C. St. p. 24; Id. note 3, at page 26, citing Road Co. v. Cane, 2 Ohio St. 420).

This power of eminent domain is absolute in the legislature unless restricted, as it is not in the constitution of 1802, except as to required compensation for private property, not public.   It is so absolute that, but for this inviolability of private property established by this single restriction, it could be taken also without compensation; otherwise the power of the legislature is supreme to do as it will for the public welfare, under the constitution of 1802.

Neither is there any restriction in that constitution as to the power to create corporations, railroad as well as others, though they were unknown, as railroads were unknown in 1802.   The only corporations especially authorized were those for literary purposes, schools, academies, etc.   Const. art. 8, § 27 (1 Swan & C. St. p. xxvi.).   That constitution interfered very little with legislative supremacy; the people having more confidence in, and reliance on, the parliamentary principle of legislative supremacy then than now.   And here it may not be improper to remark that, if any wrong was done the public or the city of Cleveland by the railroad act of 1848, when the city and this locus in quo were more like a wilderness than now, since the railroads have helped to develop it so enormously, the fault is in the want of provision of the pioneers, who were doing the best they could to develop the wilderness, not dreaming, perhaps, of magnificent cities to be grown in Ohio within a half century, to whom the franchises granted away would be valuable, if held ungranted until now.   But then, perhaps, the cities which have largely been developed by the railroads might not have been so magnificent and prosperous.   But these legislators could no more see present conditions 50 years ago than we can see accurately those to come 50 years hence.

That the legislature had the power to organize railroad corporations, and delegate to them directly—not to the cities, and, indirectly, through them, to the railroads—this power of eminent domain, there can be no question, and as absolutely as they chose, except as to restriction of compensation for private property taken.   In the case of Railroad Co. v. Adams, 3 Head, 596, it was held that the right to appropriate and use absolutely streets, alleys, and highways was an implied power in a railroad company from its charter, granting generally the power to construct a railroad from a town or city to another town or city.   It includes a right, without special grant, to enter the city and appropriate the streets.   And, if there be no restrictions in the

charter, the only obstacle to the absolute occupation, exclusively, of any street, is found in the cost of the performance arising out of compensation to abutting property owners; that is, under the constitution of 1802, governing these defendant railroad companies.

One of the learned counsel for defendants, Judge Dickey, securely planted the taproot of the power of the railroad companies and the city to make the contract of 1849 in the second section of the railroad act of 1848, which, with the other sections pertinent to this controversy, will be copied in the margin.[4]

It was the exercise of the almost unrestricted power of eminent domain under the constitution of 1802 and the act of 1848, granted by section 2 of that act to the railroad companies. It was the fruition of that power, brought about by the exercise of it by the railroad company itself, and not the city. The city was only a subordinate agency in the transaction, with not the least power or right to obstruct or restrict the appropriation of the railroad company, on its own terms, as to the quantum of use or estate wanted, which it could take according to its wants, fixed, however, by agreement with the city or by a decree of a court of competent jurisdiction; but these were each only a modus operandi of appropriating by the company all it wanted, even to the absolute estate. However this may be, as to the constitution of 1851, and the legislation made subsequently in pursuance thereof, under that of 1802 and the act of 1848 the power of the railroad company was dominant, and not that of the city, as has been argued. If the contract had specifically reserved municipal control or any further interest in the part of the street appropriated or condemned by the railroad companies, it would have been a condition accepted and binding on them. But it cannot be implied as not granted or reserved through any notion that the city's title was paramount, and that it held as the grantor of the franchise. The state granted the franchise, not the city. And, under such circumstances, the contract must be construed liberally in favor of the state's grant, and most strictly against the city, as between them, however strictly, as against the railroad companies in favor of the state, in construing the statute granting the power of eminent domain. The state represented the trust of the public, and not the city, in such a case as this. All that has been said about the city's inability to grant away the public right to use the streets, because they are held in trust for the public, may be true when it is granting privileges or franchises municipal in their character; and yet the railroad companies are not bound by that restriction when exercising the right of eminent domain, under the act of 1848 and the constitution of 1802, as the law then stood.

The power exercised was that of section 2 of the act of 1848, and is not derived from sections 11 or 15,—neither of them. Those are mere regulations, and are scarcely restrictive of the power granted in section 2. If they are restrictive in any way, of course that restriction is a limitation on the power, but not otherwise. Section 11 is that which restricts the power of eminent domain exercised by

---

4 See ("D") at end of this opinion, page 147.

the railroad company here, if there be any restriction.    Section 15 relates altogether to a different subject.    It is, like the other, a regulation of the exercise of the power of eminent domain, but it involves only the crossing of highways, streets, and streams, and not the appropriation of a street wholly or in part longitudinally.    Neither, however, is, under this act and the constitution of 1802, the grant or regulation of a license in or across the street, but the taking of it to the extent wanted by the railroad company under its right of eminent domain, subject to the respective restrictions of either section.    Section 15 is more restrictive than the other, because it does not allow, in terms, anything but a joint use, and the occupation of the crossing must not interfere with its former use as a highway or stream.    There is no such restriction in section 11, and the city cannot impose one by contract, as against the railroad company, longer than the railroad company chooses; for it may appropriate the whole, if it will.    By this contract, it has done so by the very language of it, and the restrictions as to the quantum of use sought to be imposed by implication by the city it had no power to impose.    Confessedly, the contract grants all the city had the power to grant.    It had no power to grant anything, but only to agree with the railroad company what restrictions it would accept in its exercise of the power of appropriation.    It wanted the exclusive use of about one-half of the street as it then existed, and took it, not under the contract from the city, but under the statute from the state, paying the city $15,000, when it need not have paid a cent; for the statute and the constitution do not require compensation for public property.    Neither the city nor the court of condemnation could have imposed compensation on the companies, because neither the act of 1848 nor the constitution of 1802 does that.

It is bootless to inquire what quantum of title or estate the railroad company acquired by this appropriation under its right of eminent domain.    My own judgment is that it acquired the fee along with the easement of a perpetual and exclusive use, for reasons already intimated in a former part of this opinion; for if the city owned the fee it went with the rest, and was either sold by the contract to the companies or was appropriated by them,—I think the latter.    But, if they have only the easement of a perpetual and exclusive use, it is just as effectual; for the legal title is a naked and useless thing, wherever outstanding.    As riparian owners of either the largest estate railroads can acquire for railroad uses, or of only an easement for the same uses, the 51 acres of accretions and reclaimed land from the lake goes with whatever estate they have, and that is all-sufficient for the rightful and righteous security of that which they have created by the free and vast expenditure of their money, to enable them to successfully handle their part of the commerce, state and interstate, of this continent, thereby contributing, if not creating, the wealth, power, and usefulness of this great city.

I am not unmindful of the case of City of St. Paul v. Chicago, M. & St. P. Ry. Co., 63 Minn. 330, 63 N. W. 267, 65 N. W. 649, and 68 N. W. 458, and of the able argument for its application here, but the circumstances are different as to the power.    There it was ruled that the

legislature had no power to destroy land dedicated to a specific, limited, and definite public use, and could only conform its regulation to the purposes of dedication. Here the legislature of Ohio, as we think, under the constitution of 1802, had the absolute and unrestricted right of sovereignty and power of eminent domain wherewith it could take all the original owner ever had, all the owner of the easement had, all anybody had, by whatever title, dedication, general or special, and appropriate it to the great public use of promoting commerce; and, by the second section of the railroad act of 1848, that power was granted to these defendant railroad companies and exercised by them.

Nor am I unmindful of the case of Wabash R. Co. v. City of Defiance, 52 Ohio St. 262, 40 N. E. 89. Confessedly, that case was dealing only with a right acquired under Rev. St. Ohio, § 3284, corresponding with section 15 of the act of 1848, and all it says about Rev. St. Ohio, § 3283, corresponding with section 11 of the act of 1848, was obiter. Under a different constitution, a different railroad act, and modern legislation, it holds in favor of the plaintiff as to the construction of Rev. St. Ohio, § 3283, perhaps. I do not inquire whether the constitution of 1851, and the railroad and corporation legislation, would justify any different holding than under the constitution of 1802, and the legislation of 1848; for that case was treating these two sections as the source of the railroad's and the city's power under the municipal legislation regulating the power of cities over its streets, while here we are dealing with the state's power of eminent domain, granted to these particular railroad companies in 1848, and regulating by the law, as it then stood, the rights of these parties under their contract of 1849. In my judgment, the process is one of condemnation and appropriation, through the regulations of state statutes granting the power to the railroad companies, and not one of contracting by the city under its powers over its streets, for the use of them. The grant of the use does not come from the city, but only through it; it being only an instrumentality, like the court of condemnation is an instrumentality for the exercise of the power granted to it by the railroad company from the state. The city is a pure agent and trust holder of the public, from which the state may take its streets or public grounds for the use of railroad companies, if it chooses, wisely or unwisely, as the case may be, and the dedicator or original owner has no more power to restrict the state's power of eminent domain than other people, either by his dedication or otherwise.

Neither am I unmindful of the rule of strict interpretation in favor of the public, as ruled in these cases, and by Circuit Judge Taft in the Detroit Street-Railroad Case. That is a most useful and safeguarding rule in behalf of the public; but, taking the constitution of 1802 and the railroad act of 1848, strictissimi juris, and the rule sustains this judgment, in my opinion. No case in Ohio has been cited against this construction, unless the Defiance Case be against it; but, for reasons stated, I do not think it is in the way of this judgment, and certainly it is not binding, if it be against this reasoning and judgment.

With this view of the matter in litigation, I have deemed it my duty to direct a verdict, no disputed fact being involved as to the construction of the contract, and it being purely a matter of law. Verdict directed accordingly.

("A")

## (Contract of 1849.)

This indenture, made this thirteenth day of September, in the year of our Lord eighteen hundred and forty-nine, by and between the city of Cleveland, by F. W. Bingham, mayor of said city, thereunto duly authorized by resolution of the city council of said city, party of the first part, and the Cleveland, Columbus & Cincinnati Railroad Company, by John M. Woolsey, vice president thereof, thereunto duly authorized by resolution of the board of directors of said company, party of the second part, witnesseth:

That said city of Cleveland, in consideration of the sum of fifteen thousand dollars, received by said city of said railroad company, in the capital stock of said company, for which a certificate for one hundred and fifty shares, of one hundred dollars each, full paid, of said stock, hath been issued to said city, the receipt whereof is hereby acknowledged, and also in consideration of the covenants of said railroad company hereinafter contained, hath granted, and by these presents doth grant, to said railroad company, as fully and absolutely as said city or the constituted authorities thereof have the power or legal authority so to do, the right to the full and perpetual use and occupancy for their railroad tracks, turnouts, engine and car and passenger houses, turntables, water tracks, or stations, avenues to and from the same, leaving open spaces between when deemed expedient, and other purposes connected with, and necessary for, the convenient use and working of said road, all of Bath street, in said city of Cleveland, situate northwardly of a line drawn parallel with the southerly line of Bath street, and one hundred and thirty-two feet northwardly, at right angles therefrom; excepting and reserving therefrom a piece or parcel bounded southerly by the last-described line, eastwardly by a line drawn parallel with the westerly face of the Stone Pier, so called, and one hundred (100) feet eastwardly therefrom, and northwardly by a line drawn parallel with the south line of Bath street, and two hundred and eighty-two (282) feet northwardly therefrom, which is reserved for public use as a part of Bath street: and also reserving and excepting therefrom a strip of twenty-five feet in width bounded westerly by the west face of said pier, and eastwardly by a line parallel therewith, and twenty-five feet thereform, and extending from the northerly line of said last-described parcel of land, along said pier, to the northwardly end thereof as it now is or may be hereafter extended; which is to be kept open as a public highway, and shall not be obstructed by said city, or by any person or persons or company claiming through said city, or by their permission,—to have and to hold the same to the said railroad company, its successors and assigns, upon the terms, and subject to the stipulations and conditions, following, that is to say:

Said company shall take and hold the same subject to all legal claims, either in law or equity, of any person or persons, company or companies; it being expressly understood that the city does not guaranty nor warrant either the title or the right to occupy the same, the said railroad company to have all the money compensation, interest, benefits and rights which the city could in any manner be entitled to on account thereof.

Said company shall save said city harmless from all damages to persons holding any part or parts of the premises under leases from the city, consequent upon the taking possession of the ground so leased, or in any way depriving them of the full enjoyment of their leasehold interests before the expiration thereof; it being understood that this indemnification is to extend to such damages only as the city shall be legally holden to make good to the claimants thereof.

All leases made by the city of parts of said premises shall be assigned to said company, said company to have the right to collect and receive the rents

hereafter accruing, and shall pay over to said city two-thirds of all rents collected on land fronting on the river, and lying between the south line of Bath street and a line parallel therewith, and 282 feet northwardly therefrom, until said company shall deliver to said city the possession of said strip of 100 feet in width next to the pier hereinbefore reserved.

And said company shall not renew or extend said leases, nor grant any new lease, of any part of the premises, which will interfere with the opening of Bath street to the width of 132 feet, or of the extension thereof on and near the stone pier, as hereinbefore described.

The said company shall not lease any part of the premises to any person or persons, company or companies, to be used for conducting or carrying on forwarding, storage, or commission business, or for the erection of warehouses thereon for the accommodation of such business; nor shall said company use said premises, or any part thereof, for the purpose of engaging in, accommodating, or aiding in the transaction of forwarding, commission, or warehousing business, with a view, either directly or indirectly, of deriving profit therefrom, nor shall they grant the right to any railroad company, person or persons, or other company or companies, so to do.

But this prohibition shall not be construed to prevent said railroad company from erecting on said premises a suitable warehouse or warehouses for the reception and safe-keeping of such articles of property as may be intrusted to their care for transportation, and not consigned to any person or persons or company in Cleveland having the means of storing the same; it being the object and intent of the parties to this agreement to provide that said premises shall not be so used as to interfere or come into competition with individuals, companies, or firms engaged in forwarding, commission, storage, or warehousing business in Cleveland, by carrying on or engaging in by said company, accommodating, or aiding in forwarding, commission, storage, warehousing, or other business not necessary to secure the transportation of property over their road, but may be used by said company for all purposes necessary for the convenient and profitable working of their road, subject to the restrictions aforesaid.

Said company to take and hold said land subject to all the legal rights and claims of the Cleveland & Pittsburgh Railroad Company upon the same, and to have all the benefits to accrue from such claimants, as is before provided; and, as a further provision for the same, shall, upon reasonable and equitable terms, extend to said Cleveland & Pittsburgh Railroad Company and the Cleveland, Painesville & Ashtabula Railroad Company room for warehouse and passenger depots, and such facilities for coming on to said premises with their cars, engines, and tenders, for the reception and delivery of passengers, baggage, and freight, subject to the same restrictions, as to warehousing, forwarding, and commission business, as are herein imposed upon the Cleveland, Columbus & Cincinnati Railroad Company, and for transferring them to, or receiving them from, other railroads, or from steamboats, either by independent tracks, or by the use of the tracks laid by the Cleveland, Columbus & Cincinnati Railroad Company, as shall be found most convenient to all concerned; and in case the parties cannot agree, either as to the terms or manner of occupying such part of the premises as may be so required, the same shall be determined by three competent disinterested men, one to be chosen by each party, and the third by the two so chosen; it being, however, understood that the Cleveland, Columbus & Cincinnati Railroad Company shall not be bound to permit either of said railroad companies to use for car, engine, or warehouse, or grounds on which to place or dispose of cars, engines, tenders, or other furniture of their roads, any part of said premises which said arbitrators shall decide is necessary for those purposes, to be used exclusively by said Cleveland, Columbus & Cincinnati Railroad Company; it being further understood and agreed that no part of said premises shall, after two years from this date, be used by said Cleveland, Columbus & Cincinnati Railroad Company for forges, furnaces, workshops, or anything of a similar character, for the manufacture of cars, engines, or other machinery, so as to deprive either of said other railroad companies of the full benefit of the use of part of said premises intended by this agreement to be extended to them.

Said Cleveland, Columbus & Cincinnati Railroad Company shall manage and take care of all suits or actions now pending, or which may hereafter be commenced, for obtaining possession of said premises, or any part thereof, and may compromise or settle such suits; and said company shall save said city harmless from all costs and charges on account thereof, except such as have already accrued against the city, and, in case of settlement, shall save the city harmless from all legal costs in the case in court in bank, except the costs made by the city; and shall further save the city harmless from all legal claims or demands which are now or may hereafter be set up against the city, growing out of the use or occupation of said premises by said city, or its tenants or lessees; and to enable said company to compromise and settle with the claimants Lloyd & Camp and all other claimants for the extinguishment of their claims to said premises, or any part thereof, they may allow them to retain such portion thereof as may be necessary to effect such settlement, and as shall not be deemed necessary to be used for railroad purposes.

And the said Cleveland, Columbus & Cincinnati Railroad Company doth hereby covenant and agree, to and with said city, that said company will hold said premises upon the terms, and subject to the stipulations and conditions, herein recited, and will do and perform all and singular the acts required, and abstain from doing and performing all and singular the acts prohibited, by the terms and stipulations herein recited.

In witness whereof the city council of the said city of Cleveland have caused to be hereunto affixed the seal of said city, and these presents to be subscribed by the mayor thereof. And the Cleveland, Columbus & Cincinnati Railroad Company have caused to be hereunto affixed their corporate seal, and these presents to be subscribed by their vice president, the day and year first above written.

[Seal of the City of Cleveland, Ohio.]    The City of Cleveland,
                                           By Flavel W. Bingham, Mayor.
[Seal of the Cleveland,    The Cleveland, Columbus & Cincinnati
Columbus & Cincinnati      Railroad Company,
Railroad Company.]                By John M. Woolsey, Vice President.

Signed, sealed, and delivered (the words "Alfred Kelley," in the 6th line of 1st page, being first erased, and the words "John M. Woolsey, vice," interlined above such erasure; also the word "vice" being first interlined above the second line from the bottom of the last page) in presence of
       Jas. D. Cleveland,
       D. W. Crop.

State of Ohio, Cuyahoga County, ss.: Before me, Jas. D. Cleveland, a justice of the peace in and for said county, personally appeared the within named John M. Woolsey, as vice president of the Cleveland, Columbus & Cincinnati Railroad Company, and Flavel W. Bingham, as mayor of the city of Cleveland, and severally acknowledged the signing and sealing of the within instrument to be their several voluntary act and deed, for the purposes therein expressed, this 14th day of September, 1849.
                                    Jas. D. Cleveland, Justice of the Peace.

Indorsed:
The City of Cleveland to The Clevd., Col. & Cinti. R. Rd. Co. Deed of Land in Cleveland—Bath St.

Received July 1, 1851, and recorded July 7, 1851, in Cuyahoga County Records, Vol. 51, pages 187-8-9-90.    John Packard, Dep. Recorder.

Supposed to be property listed July 2, 1851.    A. Clark, Auditor.

Cuyahoga County, Ohio, Title File No. 12. Main Line, Cleveland Division, C., C., C. & St. L. Ry.

## ("B")

### (From Answer in Holmes v. Railroad Co.)

And this defendant [the Cleveland, Columbus & Cincinnati Railroad Company], further answering, says that, for the purposes and in the manner

hereinafter stated, and under a legal authority so to do, derived from the source and in the manner hereinafter set forth, and not otherwise, this defendant is in the joint occupancy, with the said Cleveland, Painesville & Ashtabula Railroad Company, or so much of the premises mentioned in said bill, and embraced between the westerly line of water street, extended on the east to the said government pier on the west, the northerly line of the premises in said bill mentioned on the north, and a line drawn parallel with, and one hundred and thirty-two feet northerly from, the said northerly line of original lot number one hundred and ninety-one, on the south, as on the diagram hereto attached as Exhibit A, and made a part of this answer, is colored a straw color, together with the tracks thereon indicated by red lines; which diagram, this defendant avers, is a true representation showing the lands embraced in said Bath street at the time this defendant took possession of the same, and lying southerly of low-water mark,—the water line or low-water mark in said lake at the time possession was so taken,—the piling and planking that has since been done by it, the said Cleveland, Painesville & Ashtabula Railroad Company, and the Cleveland & Pittsburgh Railroad Company, northerly of said water line, and the structures which have by them, respectively, been erected on the same, as extended by such piling and planking. And this defendant, further answering, says that so much of said premises as lies northerly of said low-water mark, neither the said Connecticut Land Company, nor said trustees, nor their heirs or assigns, nor the assigns of any or either of them, ever had, or now have or has, any title whatever, and that the title to the same, both legal and equitable, and the sole control thereof, have at all times been, and still are, in said city of Cleveland, or in the public, for the sole use and benefit of the public.

And this defendant, further answering, denies that it occupies, or claims to occupy, the aforesaid parcels, through or under, in any manner, the said William B. Lloyd, or his assigns, or the other heirs at law of said Thomas Lloyd, or their assigns, or said Thomas Lloyd himself, or under or by virtue of the quitclaim deed to said Thomas from said trustees, or that this defendant now holds, or ever held, any title or interest whatever in said parcel of land, in trust for complainants, or any or either of them, or that this defendant has received a large amount of rents and issues from said land, as alleged in said bill of complaint. But this defendant admits that it does now refuse, and has at all times hitherto refused, to recognize said complainants as having any legal or equitable title whatever in said parcels, or either of them, and that it has at all times refused, and still does refuse, to account in any manner to complainants for the use of said parcels, or either of them.

And this defendant, further answering, says that as early as the year 1796 the said Connecticut Land Company, being desirous of founding a city on the Western Reserve, at the mouth of the said Cuyahoga river, and on the easterly side thereof, caused the northwesterly portion of the lands upon which the said city of Cleveland is now situated, by Seth Pease and Augustus Porter, surveyors of said company, and authorized agents thereof, for such purpose, to be surveyed and laid off into town lots, streets, lanes, and public grounds, and the town so surveyed and laid out so to be named "The City of Cleveland," and a map or plat thereof, and minutes of such survey, to be made by said Pease and Porter (commonly called the map and minutes of Pease and Porter), particularly setting forth the lots, streets, lanes, and public grounds, and describing the same by courses, boundaries, and extent, a copy of which map and minutes is hereto attached, marked "B" and made a part of this answer. That upon said map said company caused the lots so laid off to be numbered progressively from one to two hundred and twenty, inclusive, and all the lands described in said bill of complaint lying west of the west line of Water street, and north of the north line of lot number 191, and of the said Cuyahoga river, and south of the waters of Lake Erie, as indicated on said map, to be laid off as public ground, and designated as "Bath Street" (the same having no other northerly boundaries than the waters of said lake); said company intending thereby to give, and in fact giving thereby, and dedicating to the public, all the lands so designated upon said map as "Bath Street," for the purposes of a public street or

way communicating with the navigable waters of Lake Erie and said river, and for such other commercial purposes as the commerce and well-being of the future inhabitants of such city of Cleveland might require a public ground, situate as Bath street was and is, in reference to said lake and river, to be used. That, in the year A. D. 1801, said Connecticut Land Company, by one Amos Spafford, a surveyor and authorized agent of said company, for such purposes, caused the streets, lanes, and public grounds of the said city of Cleveland, surveyed and platted as aforesaid in 1796 and '7, to be resurveyed, and minutes thereof to be retaken, and a second plat to be made of the lots, streets, lanes, and public grounds in such city (which was and is substantially a copy of the aforesaid map of Pease & Porter), commonly called the plat and minutes of Amos Spafford of the city of Cleveland, a copy of which plat and minutes is hereto attached, and marked "C," and made a part of this answer, and that upon said last-mentioned plat (as upon the plat of said Pease & Porter) said company again caused all the lands lying west of the west line of said Water street, and north of the north line of said lot No. 191 and the Cuyahoga river, and south of the waters of Lake Erie, to be designated as "Bath Street"; thereby affirming the dedication and appropriation of the same, made as aforesaid in the year 1796, to the public, for the purposes aforesaid. And this defendant, further answering, says that said Connecticut Land Company, having allotted and platted the said city of Cleveland as aforesaid, proceeded to sell the lots designated in said plats in reference thereto, and long since sold out. and otherwise disposed of, the lots in said plats, and ceased to have any interest therein. That the trustees of said company long since executed conveyances of the same to the purchasers thereof, and distinctly recognized the existence and validity of the survey and plat of said Spafford in their conveyances of the lots contiguous to said Bath street. That the purchasers of said lots took possession of the same, and made valuable improvements thereon, in reference to said plat and said Bath street; and they and their assigns have ever since, for a period of more than a half century, occupied and improved said lots, and still do occupy and enjoy the same, in reference to said plat. That from the making of the said Spafford map, as aforesaid, until the present time, said land company and their assigns, so long as they continued to have any interest in the lands embraced in said plat, and the inhabitants of said city of Cleveland, have at all times recognized, and still do recognize, the plats of said Spafford and Pease and Porter as controlling evidence of the boundaries of lots, streets, lanes, and public grounds designated therein.

And this defendant, answering, says that, in obedience to the requirements of an act of the legislature of the territory northwest of the Ohio, passed December sixth, A. D. 1800, entitled "An act to provide for the recording of town plats," etc., to be found in 1 Chase's Ohio St. p. 291, c. 130, and which is made a part of this answer, said land company caused the map and minutes of said Spafford, as it had before caused those of said Pease and Porter. to be deposited in the office of the recorder of the said county of Trumbull (in which county the lands described in said plat were then situate) for record, and the same, as this defendant has been informed and believes to be true, were, on or about the 15th day of February, A. D. 1802, duly recorded by the recorder of said county, although the record of said map has long since been accidentally lost or destroyed, and cannot be found.

And this defendant, further answering, says that, as early as the year A. D. 1800, said Bath street, as delineated on the plat of said Spafford, having for its northern boundary the waters of Lake Erie, as aforesaid, with the free knowledge and consent of said land company, was opened, occupied, and traveled as a public street or way, and from thence hitherto, with the full knowledge and uninterrupted acquiescence of said company, the trustees thereof, and their respective heirs and assigns, it has been at all times regarded, used, and occupied by the inhabitants of said city of Cleveland, and the public generally, without molestation, not only as a public way in said city communicating with said lake and river, but also (and of late years extensively so) as a quay or public landing for persons and property transported, and to be transported, upon the waters of Lake Erie, and still

is so regarded, used, and occupied by the inhabitants of said city; and that for more than a quarter of a century prior to the year 1827, when the channel of the said river, as laid down on the map of said Spafford, was changed to its present location by the United States government, said Bath street was the only public way used, or which could be used, by the inhabitants of said city and the public, for the transportation of persons or or property, by vehicles of any description, to or from said lake or river.

And this defendant, further answering, says that, by an act of the general assembly of the state of Ohio entitled "An act to incorporate the village of Cleveland, in the county of Cuyahoga," passed December 23, A. D. 1814, and is to be found in volume 13, p. 17, of the laws of said state, and which is made part of this answer, so much of the·plat of said Spafford as lies northerly of Huron street was erected into a village corporate, to be known by the name of "The Village of Cleveland," and the corporation thus created invested with the powers therein mentioned, which corporation continued to exist until superseded as hereinafter stated. That by another of the same general assembly, entitled "An act to incorporate the city of Cleveland, in the county of Cuyahoga," passed March 5, A. D. 1836, and to be found in volume 34, p. 271, of the Local Laws of said state, and which is also made part of this answer, all the lands embraced in the plat of said Spafford lying eastwardly of the present channel of the Cuyahoga river, together with additional territory, was declared to be a city, and the inhabitants thereof created a body corporate and politic, by the name and style of the "City of Cleveland," and invested with such powers and trusts touching the streets, alleys, public grounds, and harbor within the corporate limits thereof as are specified in said act, which powers and trusts have from thence hitherto been, and still are, exercised and executed by said corporation, and that said Bath street at all times since the passage of said acts of incorporation, respectively, with the knowledge and acquiescence of said land company, its trustees, and their respective heirs and assigns, has been claimed, regarded, controlled, and regulated by the inhabitants and corporate authorities of said village and city as one of the streets and public grounds thereof, and still is so claimed, regarded, and governed by the corporate authorities of the said city of Cleveland, and the use of the same, as such, has never been in any wise vacated or abandoned by said city or its inhabitants; and this defendant avers that by reason of the premises aforesaid said Bath street is in fact one of the public streets and grounds of said city; that the legal title thereof, as this defendant is advised·by counsel learned in the law, is now vested either in the said city of Cleveland or the public, in trust for the uses and purposes intended as aforesaid by said·Connecticut Land Company, in dedicating the same as aforesaid·to the public, and that the public has the right to use the same for such purposes without molestation from complainants.

And this defendant, further answering, says that, after the channel of the Cuyahoga river, as delineated on the plat of said Spafford, was changed to its present location, as aforesaid, the government of the United States, on the easterly thereof, at its mouth (to render said river accessible to water craft navigating Lake Erie), constructed permanent improvements, extending into said lake more than a quarter of a mile from the northerly or water line of said Bath street, as it was when said channel was changed. That, by reason of said improvements and lesser ones made by the inhabitants and corporate authorities of said city at great expense, the encroachment of said lake upon said Bath street, which at times had threatened wholly to submerge the easterly portion thereof at and in the vicinity of·said Water street, and render the same useless for the purposes to which it was dedicated as aforesaid, have been stopped, and that part of said Bath street easterly of, at and in the vicinity ·of, the east pier of said river, has been increased in width, by slow and imperceptible alluvial formation, so that the greater portion of the land embraced between the southerly line of said Bath street and said water line or low-water mark, as the same was when this defendant took possession of said premises, has been formed by accretion, and lies northerly of the water line of said street as it was when said·channel was changed; and that, notwithstanding said Bath street has increased in width, the rapid growth of the said city of Cleveland, and the incessant and increasing wants of its

commerce, and of its inhabitants, more than keep pace with the increase of said street, and imperatively require every part and parcel thereof, enlarged as it is, to be used for the commercial purposes, to which it was devoted as aforesaid, by the original proprietors of said Western Reserve, and will ever require the same, however much it may be enlarged by the means aforesaid, to be thus used and appropriated.

And this defendant, further answering, says that it is a body politic and corporate, duly organized under, and created by, an act of the legislature of the state of Ohio passed March 14, 1836, "An act to incorporate the Cleveland, Columbus & Cincinnati Railroad Company," and under and by virtue of another act of said legislature passed March 12, 1845, entitled "An act to revive the act entitled 'An act to incorporate the Cleveland, Columbus & Cincinnati Railroad Company,' " and under and by virtue of the several acts of said legislature amendatory and supplementary thereto, and under and by virtue of certain sections of the act of said legislature passed February 11, 1848, entitled "An act regulating railroad companies," especially the eleventh section of the last-named act, which sections were duly adopted by this defendant as a part of its charter on the 20th day of May, 1848; all which acts and parts of acts are made part of this answer.

And this defendant further avers that it has been such body politic and corporate for more than six years last past, and that, under and by virtue of the power conferred upon it by said acts and parts of acts, this defendant has constructed, and is now successfully operating, a railroad extending from the grounds so in its occupation, in said Bath street, in the city of Cleveland, to the city of Columbus, in the county of Franklin, in said state, to the great advantage of the public at large, and especially of the inhabitants of the said city of Cleveland, and to fully secure to the public the benefits contemplated in the charter of this defendant in the working of said railway; it being necessary to connect the same with the waters of said lake and river, within the limits of said Bath street, for the delivery of freight and passengers, and the exchange of freight and passengers with other roads, and with water craft navigating said lake and river, and the same being also a suitable place for the terminus of said railway within said city, this defendant, under a license obtained from said city of Cleveland on the 13th day of September, A. D. 1849, has laid down, in a proper manner and not otherwise, its railway tracks upon said Bath street, as shown in said diagram, and in such manner as to connect its said railway with the waters of said lake and river, and this defendant is now, and for some time past has been, running its railway carriages, in connection with said Cleveland, Painesville & Ashtabula Railroad Company, upon the tracks so laid down to and from said river and lake, for the purposes aforesaid, in a prudent manner, at reasonable times, and so as to work no inconvenience to other legitimate uses of said street.

And this defendant, further answering, says that, to make said exchange with a due regard to the safety of persons and property, it was indisputably necessary to provide suitable railway fixtures and improvements upon some part of said Bath street, and that for such purposes, and for such purposes only, this defendant, with the consent of said city of Cleveland, and in conjunction with said Cleveland, Painesville & Ashtabula Railroad Company, has also constructed, and is now using and maintaining, in a reasonable manner, the structures for depots, engine houses, and other railway fixtures indicated on said diagram as in the joint possession of this and the last-named company, all which are necessary to the convenient management of the said road.

And this defendant, further answering, says that the harbor accommodation afforded by said river being inadequate to the commercial wants of the inhabitants of the said city of Cleveland, and the channel of said river contiguous to said Bath street being also too small and otherwise insufficient to admit of the safe and convenient ingress and egress to and from the same of the largest class of water craft navigating said lake, to effect, conveniently and safely, exchanges of passengers and freights with such craft, it was necessary for this defendant, and the said Cleveland, Painesville & Ashtabula Railroad Company, to connect, in a suitable manner, and to a depth of water sufficient for the safe approach thereto of such craft, a wharf upon

that portion of the premises embraced in said diagram, and lying northerly of the water line or low-water mark between said Bath street and said lake, and thereon shown to be in the joint possession of this and the last-named company, and in connection with said last-named company it has constructed such wharf, and laid down thereon the tracks and erected the other structures shown on said diagram; and this defendant, in connection with said Cleveland, Painesville & Ashtabula Railroad Company, is now, and for some time past has been, for the purpose of making such exchanges, working in a prudent manner, and without inconvenience to the public, its railway carriages upon said tracks, and this defendant, when necessary so to do, has also used portions of said wharf as a place of temporary deposit for property awaiting transportation. And this defendant submits and insists that it has the right, as a component part of the public, to occupy, with the consent of said city, said Bath street, in the manner and for the purposes aforesaid; that such are a great public accommodation, and not incompatible with the purposes intended by said Connecticut Land Company in dedicating the same to the public as aforesaid, but consistent therewith; and that the city of Cleveland, in permitting this defendant thus to use a limited portion of said street, and thereby distributing its legitimate use so as to best subserve the convenience and business interest of its inhabitants and the rest of the public, has committed no breach of trust, nor violated any public or private right, but performed, rather, a duty which is owed as well to the forecast of said land company as to the public.

And this defendant, further answering, submits, if it is mistaken in the opinion hereinbefore expressed that the legal title of said Bath street is now vested in said city of Cleveland, or in the public in trust for the inhabitants of said city, and the same is in fact held by said Lloyd, or his assigns, or the heirs of the survivor of said trustees, that the parties who hold the same, whoever they may be, have no beneficial interest in said street, and hold the legal title thereof in trust for the uses and purposes intended by said land company in dedicating the same to the public as aforesaid, and ought not to be permitted, in a court of equity, to disturb or molest this defendant or the rest of the public in the legitimate use of the same.

## ("C")

## (From Answer in Price & Crawford Case.)

That, after the location of the railroad from Columbus to Cleveland, it became necessary, in the opinion of the directors, to obtain the whole of the tract of land called "Bath Street," and they made a formal appropriation of the same by resolution on the 18th of September, 1848. The entire title of that tract was involved in a controversy between the city of Cleveland and said Camp & Lloyd. That suit was then depending for the possession of said premises. That a suit had already been decided against the city, and was then depending in the supreme court of Ohio on exceptions to the judgment of the court of common pleas. That the opinions, not only of people generally, but also of men professing to understand the legal questions involved in the controversy, differed so much as to the probable result that it was impossible to anticipate the event. That it was the interest and wish of the respondent to get clear of all controversies, whether legal or otherwise, and for that reason this respondent was unwilling to have said company obtain possession of said property by the power given them by their charter, but proposed and believed it to be for the interest of this respondent, and all parties having any interest in said property, to make an amicable arrangement, by which the said company might be invested with all the rights of this respondent in said property. Upon these views, this respondent being compelled to transfer to said company said property, and preferring to do so under a negotiation, than to have it taken under and by virtue of said company's charter and appropriation, and desirous of avoiding all controversy with said company, for the convenience and advantage of this respondent the said negotiations and contract were made between said company and respondent; but this respondent has in no instance had the wish or purpose of obtaining

any unfair or dishonest or fraudulent advantage of said complainants, or of any other party or person having a claim or interest in said premises, or any part thereof, nor has said company, so far as respondent knows or believes, been guilty of any act of bad faith or injustice towards any person or party intrusted in said premises, or any portion thereof. Respondent admits it to be true that, by the terms of the contracts between the city of Cleveland and said company made on the 13th day of September, 1849, as aforesaid, said company took the interest of the said city in the said Bath street property, subject to all the rights and privileges of all other persons which would be legally enforced against the property had the city continued to hold the same, and also assumed all the legal liabilities to other persons which rested on the city in the relation to said property, up to that time; but this respondent utterly denies that the city or said company, or the assignees in the premises, was or ever could become liable to the complainants or other lessees of said premises on account of any failure of title in the city. And this respondent, further answering, says that said city, in the leases now held or claimed by the complainants, as well as in all other leases granted by her on Bath street, guarded herself in the strictest manner against any implied liability to guaranty the possession of the lots leased, and provided that an eviction of the lessee should merely stop rents, but that said city should not be liable to pay any damages. Respondent, further answering, admits it to be true that judgment was rendered in the court of common pleas in favor of said Camp & Lloyd in the suits embracing the premises claimed by the complainants, in pursuance of the agreement made by said company with said Camp & Lloyd on the said 8th day of August, A. D. 1849, as aforesaid, not because the contests of the suits was given said company, as alleged in the bill, but because said company, as this respondent is informed and believes, having succeeded to the rights of the city as aforesaid, and having by said agreement with said Camp & Lloyd compromised all matters in controversy, ceased to make a further defense to said suit, and permitted judgment to be entered. And this respondent is informed and believes that said compromise was a fair and reasonable one, and such as said company was freely justified in making. That there was nothing in the relation which had previously existed between the said city and the complainants which required the city, while holding its original interest against said company after the contract of the 13th of September, 1849, to persist in maintaining a series of doubtful and expensive lawsuits, when a peaceable compromise of the same would be made. Respondent, further, is informed and believes, that, in making the same compromise, the railroad company obtained from said Camp & Lloyd the best terms which they would be induced to grant, and so far as these terms seemed to said company the rights which said city has previously claimed. Respondent is informed and believes that it will furnish to the various lessees a full protection against the reverse claim of said Camp & Lloyd, and protect them in their several leases, so far as they themselves have performed their covenants in the same. But this respondent is informed and believes that, by the terms of said compromise, said company failed to obtain any interest in, or control over, any part or portion of the premises claimed by the complainants, except a small part in the lots 6 and 7, and that said company disclaims any interest in or under it over the residue of the lots claimed by said complainants.

## ("D")

## RAILROADS.

## An Act Regulating Railroad Companies.

(Passed February 11, 1848. 46 Ohio Laws, p. 40.)

Sec. 2. Said corporation shall be authorized to construct and maintain a railroad, with a single or double track, with such side tracks, turnouts, offices and depots as they may deem necessary, between the points named in the special act incorporating the same, commencing at or within, and extending to or into any town, city or village named as the place of beginning, or ter-

minus of such road, and construct branches from the main line to other towns or places within the limits of any county through which said road may pass.

Sec. 11. If it shall be necessary in the location of any part of any railroad to occupy any road, street, alley or public way or ground of any kind, or any part thereof, it shall be competent for the municipal or other corporation or public officers, or public authorities, owning or having charge thereof, and the railroad company to agree upon the manner, and upon the terms and conditions upon which the same may be used or occupied; and if said parties shall be unable to agree thereon, and it shall be necessary in the judgment of the directors of such railroad company, to use or occupy such road, street, alley, or other public way or ground, such company may apply to the court of common pleas of the county in which the same is situate, setting forth the aforesaid facts, and said court shall thereupon appoint at least three judicious disinterested freeholders of the county, who shall proceed to determine whether such occupation is necessary, and if necessary, the manner and terms upon which the same shall be used, and make return of their doings in the premises to said court, who shall, if they deem the same just and proper, make the necessary order to carry the same into effect, or they may order a review of the same, as such court may consider justice and the public interest require.

Sec. 14. Such company may acquire, by purchase or gift, any lands in the vicinity of said road, or through which the same may pass, so far as may be deemed convenient or necessary by said company to secure the right of way, or such as may be granted to aid in the construction of such road or be given by way of subscription to the capital stock, and the same to hold or convey in such manner as the directors may prescribe; and all deeds and conveyances made by such company shall be signed by the president, under the seal of the corporation; and any existing railroad corporation may accept the provisions of this section, the five preceding sections of this act, or either of them, and after such acceptance, all conflicting provisions of their respective charters shall be null and void.

Sec. 15. It shall be lawful for such corporation, whenever it may be necessary in the construction of such road, to cross any road or stream of water, or to divert the same from its present location or bed; but said corporation shall, without unnecessary delay, place such road or stream in such condition as not to impair its former usefulness.